### Brown's Heirs v. Bank of Chambersburg.

An entry or memorandum in writing made by the owner of lands in a book, called by him his deed book, in the regular course of business, is receivable in evidence as an acknowledgment of title in the person named therein; against him who made the same, and those claiming under him by subsequent grant.

A sheriff's vendee claiming title under the alleged grantor, and who purchased with notice of the title of a prior grantee, stands in the same situation as the grantor; and an entry in the grantor's own books and in his own handwriting, would be persuasive evidence, and in some cases conclusive proof, against the grantor or his subsequent grantee; but the effect to be given to such evidence depends upon the entry itself and the accompanying parol proof.

Where an entry was made in the books of a grantor, thus: " Granted lots Nos. 3 and 4, by deed, dated the 25th of March, 1790, to E. C.," bounding and describing the lots, which entry was crossed; and in different ink the following memorandum was made: " Give (or gave) a new deed to W. B., Esq.," it was *held*, that the natural inference to be drawn from these entries without further explanation, was, that some contract or understanding existed between the grantor and E. C., who was his sister, and was married to W. B., in relation to the two lots; and whether it were a sale for a valu-

able consideration, or a gift accompanied with possession, was of no consequence, as in either case the title would pass, which could not be impaired without the assent of the grantee or devisee.

In the absence of the deed, such entries, with parol proof that the grantor said his sister was the owner of said lots, is some evidence of a contract or gift, which was consummated by deed.

A deed implies a consideration; for it must be taken, that if it were made, it was made in the usual form, passing a fee, and for the valuable consideration expressed therein.

*It seems*, that it was not necessary that the precise nature of the agreement should appear; since whatever it may have been, this evidence was sufficient to justify the jury in finding a contract.

*It seems*, that the memorandum with the parol evidence which is to be taken most strongly against the grantor, is to be understood without further explanation, as importing a legal and perfect title, from which a jury might infer all the *formula* necessary to complete the title, including delivery.

If the entry in this case were crossed after the marriage of E. C., the grantee or donee, with W. B., it would not divest her rights, or those of her heirs, in the property.

If the title to the lots were ever vested in E. C., she could not be divested of it without her consent; and if she were then a feme covert, that consent could only be given in the manner prescribed by the statute.

As the defendant was a purchaser at sheriff's sale; the plaintiff can only avail himself of the title of which he gave notice at such sale.

ERROR to the Common Pleas of Franklin county.

*June* 11 and 12.    Samuel M. Hankins and Hetty, his wife, Hadessah C. Brown, George L. Brown, and Benjamin C. Brown, by their next friend and guardian, Mary J. Brown, heirs of Esther Brown, brought this ejectment against the Bank of Chambersburg and Samuel Fisher, for two lots of ground, with a two-story brick building and other buildings thereon erected, situated in the borough of Chambersburg.

It appeared on the trial, that both parties claimed under the same title.    The plaintiffs gave in evidence, a patent from the Commonwealth to Benjamin Chambers, dated 14th of March, 1742, for five hundred and twenty-three acres and allowance, which covered the lots in dispute; also a deed from Col. Benjamin Chambers to his son, Capt. Benjamin Chambers, dated 5th of June, 1781, for two hundred and five acres, which included the premises in controversy. Under this deed it appeared, that the grantee, Capt. Benjamin Chambers, was to pay to his sister, Esther Chambers, $1000.    The death of William M. Brown, who married the said Esther Chambers, in November, 1791, and the possession of the defendants, were admitted.    The plaintiffs then offered to read to the jury a memorandum in writing, entered in a book admitted to be that of Capt. Benjamin Chambers, and the entry to be in his handwriting, of a deed made by him to Esther Chambers, on the 25th of March, 1790, for the lots in dispute, accompanied with proof of a search for said deed.    This

·offer was objected to by the defendants; when the plaintiffs called and examined George Chambers as a witness, who testified, in substance, as follows :—

"I am one of the executors of Capt. Benjamin Chambers; always had possession of all the papers. I have searched diligently among the papers of Capt. Benjamin Chambers for the deed from him to Mrs. Brown, and could not find it. I have known this book (deed-book of Capt. Benjamin Chambers, containing the memorandum offered in evidence, as above) for about fifty years; has been in my possession since the death of Capt. Benjamin Chambers, in 1813. In 1829, I made an examination among the title papers of William M. Brown, Esq., so far as related to the lands purchased by the bank. I gave the bank all I found; found no deed to Mrs. Brown amongst them. I afterwards became executor of Lazarus Brown, with whom, William M. Brown, his brother, had left his papers. I searched, but found no such deed. Within the last few days I made a search amongst these papers, but found no deed amongst them to Mrs. Brown for the lots in dispute." An account-book was then handed to witness, who said, "This is the book of accounts of Capt. Benjamin Chambers, and of the account with William M. Brown, and is in the handwriting of Capt. Chambers, except a few entries at the bottom of page 109, which are in my handwriting. It has been in my possession since the death of Capt. Chambers. This account was settled between the parties in my presence, in March, 1808, as it stands here stated."

The plaintiffs then proved by Joseph Chambers, that he had searched carefully in the recorder's office, for a deed from Capt. Benjamin Chambers to his sister Esther Chambers; but that he could not find such deed on record.

The entry and memorandum, as contained in plaintiff's offer, were then read in evidence, from the deed-book of Capt. Benjamin Chambers. The entry was in the following words, and crossed in the following manner :—

"Lot No. 3 and 4. Granted by deed bearing date the 25th March, 1790, lot No. 3 and 4 to Esther Chambers, bounded and described as follows: Beginning at a post on Market street, on the west side of Conogogig; thence with said street westward one hundred and twenty feet, to lot No. 5; thence with said lot northward two hundred and fifty-six feet, to an alley; thence with said alley eastward one hundred and twenty feet, to lot No. 2; thence with said alley southward two hundred and fifty-six feet, to the place of beginning."

In a different ink, was the following memorandum: "Give (or gave) a new deed to Will. Brown, Esq."

The above entry and memorandum were given in evidence, under objection by the defendants; and their admission by the court constituted the subject of defendants' first bill of exception.

The plaintiffs then offered in evidence the deposition of William M. Brown, taken on a commission to Mississippi, in a certain bill to perpetuate testimony between the heirs of Esther Brown, deceased, plaintiffs, and the Bank of Chambersburg, defendant. The defendant objected to the whole of the answer to the second interrogatory. The court overruled the objection; and this was defendant's second bill of exception.

In answer to the interrogatories, the deponent said, in substance, "that he was well acquainted with the property in controversy: that it had been the place of his family residence from 1792 until 1820, when he removed to the country; but that he continued to rent the same until it was sold by the sheriff to the Chambersburg Bank; that shortly after his marriage with Esther Chambers, the youngest daughter of Col. Benjamin Chambers, sen., which was in the month of November, in the year 1791, he was looking out for a dwelling-house for himself and family, when Capt. Benjamin Chambers, his brother-in-law, said to him, 'Why not build on your wife's lots on the west side of the creek? (Meaning the Conococheague creek.) There,' said he, 'sister Hetty has two lots, and they are in a fine situation for a dwelling-house.' This deponent then reflected upon it for some time, consulted with his wife and some of his friends, and finally agreed, that if he, Captain Chambers, would sell him four other lots, adjoining to his wife's two lots, and would also sell him out the *quit rents* of the whole six lots, that he would then build there. To this proposition the said Captain Chambers assented; though he had previously refused to sell the *quit rents* to several others, who had proposed to buy out theirs. And when the said Chambers and deponent proceeded to lay off the said lots, they began at Jacob Smith's corner, being No. 2, in the plan of said town, and laid off Nos. 3 and 4, being Mrs. Brown's two lots, of sixty feet each, on Market street; and then laid off Nos. 5, 6, 7, and 8, being also sixty feet each on said Market street; which brought us within a few feet of a street or a road which had been previously laid out, (deponent thinks to Strasburg;) and Chambers then observed to deponent, 'I will throw you in these few feet. For the first two lots, adjoining Mrs. Brown's two, to wit, for the Nos. 5 and 6, this deponent agreed to give Captain Chambers £20 or £25 each; and for the next two, to wit,

for the Nos. 7 and 8, he agreed to give him £18 or £20 each. It is true, that this deponent did not pay cash for any of those lots; and the reason why he did not do so, was, because Captain Chambers was indebted to deponent's wife; he being bound by the deed of Col. Benjamin Chambers, sen., his father, conveying the town property to him, to pay to his sister, Esther Chambers, £1000; one half thereof when she came of age, and the residue thereof in three years thereafter, as deponent understood and believes. The deponent further stated, that he is well assured, that he never paid one cent, or agreed to pay one cent, for the lots Nos. 3 and 4, adjoining Jacob Smith, sen., on Market Street; which lots were uniformly admitted, by all the parties concerned, to belong to deponent's wife, previous to her marriage with deponent; and as to them, therefore, he could buy nothing, nor pay any thing, except for the quit rents; which he admits that he did do as aforesaid; and which was the only reason why they were included in the deed from Chambers and wife to this deponent."

The deponent further stated, "that he then proceeded to draw the deed from Captain Chambers and wife to himself, dated the 30th day of April, in the year 1792, and recorded in the office for recording of deeds for the county of Franklin, in book B, page 543; which said deed is in deponent's handwriting; conveying the whole six lots of sixty feet each, and four feet over, as above stated, to himself in fee-simple; and stating the consideration to be £155; which may be a trifle too much or too little, as he did not deem it in any way material. The deponent further stated, that he was informed by Captain Chambers, and also by his wife, previous to his receiving the deed aforesaid from said Captain Chambers and wife to himself, for the six lots aforesaid, that there had been a deed or deeds for the lots Nos. 3 and 4, adjoining Jacob Smith, sen., No. 2, made to Esther Chambers before her marriage; but that he never saw the deed or deeds aforesaid, nor does he know, of his own knowledge, whether the said deeds to Esther Chambers were from Benjamin Chambers, sen., her father, or from Benjamin Chambers, jun., her brother; nor does he know when the said deed or deeds were destroyed, nor by whom they were so destroyed. Deponent further stated, that he immediately proceeded to build on the said lots, Nos. 3 and 4; and that Captain Chambers requested him to give orders during the progress of his building, that deponent might think proper, to any of his workmen, on him the said Chambers, as many of them were indebted to him, the said Chambers; and deponent states, that he did accordingly give orders to several of his

workmen on the said Chambers, which he accepted and paid, and which deponent credited on a final settlement with said Chambers. Deponent further stated, that he made a settlement with the said Captain Chambers, somewhere about the year 1798 or 1799, for the sum or sums of money, due his wife; and at which settlement George Chambers, Esq., was present; and which settlement, if the same has been preserved, will satisfactorily show, that there was nothing paid by deponent, for the lots Nos. 3 and 4, except for the quit rents, as above stated."

The plaintiffs then offered in evidence the account-book of Capt. Benjamin Chambers, containing the accounts against William M. Brown, as referred to by George Chambers in his testimony, and by the said William M. Brown in his deposition. Objected to by the defendants. The objection was overruled by the court; which was defendant's third bill of exception. The following accounts, from page 8 of the account-book, against William M. Brown, were then read in evidence.

"William Brown, Esq., Dr.

"1792.                                                £    s.   d.
29th June. To balance brought from L. C., p. 124,      141  17   0
           To amount of Hetty's account in L. C., p. 128,  145   7  11
           To 2 lots at £25,          -    -    -   £50
           To 2 do. at £20,           -    -    .  40
           To the ground-rent on six lots,
               at 12l. 10s. each,     -    -    -   75  165   0   0"

On page 109 of the same book it appeared, that the whole account, amounting to 1298l. 18s. 1d., was settled in March, 1808, by William M. Brown with Capt. Chambers; and that the account was composed in part of orders on Capt. Chambers, which were accepted and paid by him, and of payments made by him to brickmakers, and for mill accounts.

The defendants then gave in evidence a deed from Capt. Benjamin Chambers to William M. Brown, Esq., for the lots in dispute, dated 30th of April, 1792; consideration £155. This deed was duly acknowledged and recorded. They also gave in evidence the record of a judgment in the Common Pleas of Franklin county, in favour of the Bank of Chambersburg against William M. Brown. On the 18th of November, 1823, this judgment was revived for $18,701 35. On this judgment, so revived, a writ of al. fi. fa. was issued to November Term, 1824, No. 7, under which a levy was made on the lots in controversy, and several other tracts of land of the defendant. On the 7th of August, 1826, the lands so levied upon were sold by the

sheriff to the Bank of Chambersburg; the lots for $505. Deed for the property, from the sheriff to the bank, dated and acknowledged 16th of August, 1826.

The plaintiffs then recalled George Chambers, who said, "I remember of Mr. Washington giving notice at the time of the sheriff's sale, that Mrs. Brown claimed this property. This paper was put upon the court-house where the sale was being made, at the time of the sale. I recollect of Mr. Washington taking it down and asking me to identify it by writing my name on it, which I did. This is the paper, dated 7th August, 1826."

The paper was then read to the jury, in the following words :—

"NOTICE.—A lot of ground situated in the borough of Chambersburg, bounded by Market street on the south, lot of John King on the west, an alley on the north, and lot of Mrs. Smith on the east, has been advertised by the sheriff to be sold as the property of William M. Brown, Esq. Notice is hereby given to purchasers, that this property is claimed by Mrs. Hester Brown, (the wife of said William,) under a deed from the late Benjamin Chambers, Esq., conveying the same to her in fee-simple before her marriage; that the said William M. Brown has no other estate in this property than a tenancy by the curtesy; and that Mrs. Esther Brown's right to it will be asserted."

This note was endorsed, George Chambers.

The defendants requested the court to charge the jury, on the following points:

1. That there is not evidence of the actual conveyance by Captain Chambers to Esther Chambers, and the delivery of the deed to her; nor is there any evidence of the contents and consideration of the deed.

2. That the memorandum in the book of Captain Chambers, cancelled by himself, is evidence that no deed was ever delivered; and that he had a right to cancel it, and did cancel it.

3. That it ought to be presumed, that Captain Chambers, in conveying the property to Wm. M. Brown, was acting fairly, and had the right to convey; and that the deed to Esther Chambers, if ever such deed was made at all, was intended as a gift without consideration, and might be retracted and the deed cancelled at any time before actual delivery; and that it ought to be presumed, that he had honestly acted in the matter, with full knowledge and consent of all parties.

4. That no trust can result to the wife, because the money paid came to the husband from the personal estate of the wife.

5. That the evidence on the part of plaintiffs is not such as to give them a title in opposition to the deed recorded, and possession and improvements made under it for thirty-four years, before any notice to the public of their claim.

The court, (BLACK, President,) after referring to the facts in evidence, read the first and second points submitted by the defendants, and charged, in substance, thus:

" We answer these two points then, by saying, that this evidence, when taken together, is sufficient to show that a deed was made and executed—that is, written, signed and sealed—by Benjamin Chambers, jun., to Esther Chambers; (10 Serg. & Rawle, 174;) but not sufficient to prove that such deed was delivered. The crossing of the entry, and the subsequent deed to Mr. Brown, is, on the other hand, some evidence that it was either not delivered, or that it was cancelled and destroyed with Mrs. Brown's consent, at a time when she was capable of giving that consent. This opinion is strengthened by the proof adduced on the part of the plaintiffs, which shows that neither Mr. Brown nor Mrs. Brown ever had it, so far as can now be discovered. Mr. Brown says he never saw it. It has been sought for, in short, without success. Can this deed, which no witness ever saw, and of which Mr. Brown himself was wholly ignorant, have been in existence as a valid and good deed at the time of the marriage? If it had been, would it have been either unknown to or disregarded by Captain Chambers and Mrs. Brown, six months after the marriage?

" 3d point.—It is true that the parties are to be presumed to have acted honestly. There is not in this case the slightest proof, which could go to justify a suspicion of misconduct against any of them. If Mrs. Brown had bought and paid for the property, and had received a conveyance for it before her marriage; and if, afterwards, her husband and brother made another conveyance between them, with the intention of defeating her right and vesting the title in the husband, their conduct would be wrong; and such you cannot suppose it to have been without evidence. It is probable, that the title being in Captain Chambers, in 1792, he executed the intention he had previously formed, of giving the lots to his sister, by making the deed to her husband; which all parties would, at that time, naturally enough suppose to be the same thing, or better than giving the deed to her.

" 4th point.—The law is as here stated.

" 5th point.—If the deed was never delivered to Mrs. Brown; if it was delivered, but before her marriage it was cancelled or destroyed

with her consent, then Mr. Chambers had a right to convey it to Brown, and the verdict ought to be for defendants.   If Mrs. Brown, while a single woman, made a contract for the purchase of these lots from her brother, and paid the consideration for them; and if this contract was executed by making a deed to Wm. M. Brown, without her previous consent, then the equitable title might be in her. I have, however, already said, that there is no evidence of delivery of the deed; and I now say, that there is none whatever of any contract between B. Chambers and Esther Brown."

To this charge, the plaintiffs excepted.   The jury found for the defendants; when the plaintiffs sued out a writ of error, removed the record to this court and assigned the following errors:

" The court erred in instructing the jury—

" 1.  That the plaintiffs could not recover unless Captain Chambers had duly executed and delivered a deed to his sister, Esther Chambers, whilst single.

" 2.  That the only evidence of a deed to Mrs. Brown was the memorandum in Captain Chambers' book.

" 3.  That the evidence was not sufficient to prove that the deed was delivered; but only that it was written, signed and sealed.

" 4.  That the crossing of the entry was evidence that the deed was not delivered.

" 5.  That the crossing was evidence that the deed was cancelled or destroyed with Mrs. Brown's consent, at a time when she was capable of giving consent.

" 6.  That Mrs. Brown never had the deed, and that Captain Chambers and Mrs. Brown wholly disregarded it.

" 7.  That to entitle the plaintiffs to recover, Mrs. Brown must have bought and paid for the property and received a conveyance for it; that Captain Chambers had merely formed the intention to give the lots to his sister, and executed it by making the deed to her husband.

" 8.  That if the deed had been delivered to Mrs. Brown, but before her marriage, it was cancelled or destroyed with her consent, &c.; there being no evidence whatever of a cancellation or destruction.

" 9.  That there was no evidence of the delivery of the deed, and none whatever of any contract between B. Chambers and Esther Brown—withdrawing the same from the jury."

*Chambers*, for plaintiff in error.—1. The declarations of Captain Chambers to William Brown, that the premises were Mrs. Brown's; and notice to William Brown by B. Chambers and Mrs. Brown; possession taken by Mrs. Brown by her husband, whose possession was

hers; the £1000 owing by B. Chambers to her, laid out in building the house, by materials, orders, &c.—made out a perfect title for the plaintiffs, and required no " deed duly executed and delivered." For a parol sale is good, though only *part* possession is taken, and though tenant merely agrees to pay the rent to vendee. 1 Whart. 434; 3 Watts & Serg. 56 ; 8 Watts & Serg. 58, 59.  Ingham *v.* Beach, 1 Penna. Rep. 389, is a stronger case than this.

2. The memorandum of B. Chambers, uncontradicted, was not only *primâ facie,* but conclusive proof that he had signed, sealed and delivered—made a valid, operative deed—transferring the fee to his sister; " was evidence of a conveyance in fee" to Esther Chambers.

A recital that two lots " became the property of A."  " It is a presumption of law that it was an estate in fee in A., and not for life ; which may be contradicted by showing it was for a less estate than a fee-simple.  A recital is *not a conveyance,* but evidence of a conveyance."   6 Binn. 418 ; 1 Whart. 425—428 ; 3 Johns. Cas. 175 —177.

" Convey" is equivalent to " grant."   1 Kinne's Comp. 313.

A recital in a will is an estoppel.   1 Johns. Cas. 174, 175, 177.

3. No evidence stronger (uncontradicted as in this case, conclusive) than the declarations and memorandum of B. Chambers. 4 Serg. & Rawle, 174 ; 10 Serg. & Rawle, 275 ; 3 Rawle, 437 ; 1 Watts, 152; 1 Watts & Serg. 245—249 ; 3 Watts & Serg. 373.

In The Union Canal *v.* Young, 1 Whart. 412—425, and in Union Canal *v.* Loyd, 3 Whart., similar memoranda were admitted ; even the minutes of the company, accompanied with proof that Robert Morris was president of the company.

As a mere memorandum of a deceased person, made against his interest in an ancient deed book, and made in the usual course of business, it was evidence of the sale to Esther Chambers.   1 Smith's Leading Cases, 221, 223, 224, 225 ; 2 Smith, 221, 228, 229, 235 ; 12 Serg. & Rawle, 49, 83 ; 4 Watts, 48 ; 4 Watts & Serg. 396—399 ; 1 Whart. 412 ; 2 Rawle, 72.

No cancellation of a deed revests or conveys the title.   Cru. Dig. part 3, 370, § 11, 12 ; 2 Johns. Rep. 87 ; 1 Fonb. 206, 207 ; Kinne's Comp. No. for April Term, 1846 ; Stroud's Dig. Penna. 828.

4. William Brown, the second vendee, proved that his wife and B. Chambers told him that a " deed had been made" to Esther Chambers.   The lots were included in the second deed, merely to extinguish the lien of the quit-rents, and was not disregarding the deed to Esther Chambers.

5. Mrs. Brown need not have paid a valuable consideration, and need not have had a conveyance. If a valuable consideration was necessary, the law would presume payment; for B. Chambers would not have made the verbal and written declarations he did, had he not been paid. 2. A voluntary deed, with notice, is good against purchasers and creditors, even though grantor was indebted, of which there is no pretence here. 1 Story's Equity, 345—409; 12 Johns. Rep. 558, 559.

"A voluntary deed is good, unless there be clear and decisive proof that the grantor never intended to part with it; and if he retain it, *there must be other circumstances beside the mere fact of his retaining it* to show that it was not intended to be absolute." Souverbye v. Arden, 1 Johns. Ch. Rep. 240, 256, 257; Bunn v. Wynthrop, Ibid. 329, 336; Verplank v. Sterig, 12 Johns. Rep. 536—548; 1 Madd. Ch. 222, 223; 8 Johns. Cas. 175, 177; 1 Kinne's Comp. 307; 2 Kinne's Comp. 162.

6. No evidence of cancellation. If no evidence, error to leave to jury. 5 Watts, 49, 275; 6 Watts, 487; 8 Watts, 385.

The charge was a direction to the jury that they should find for the defendants. 3 Penna. Rep. 373.

When the defence is matter of fact, it is error to instruct the jury that a defence failed and plaintiff entitled to recover. 5 Watts, 441.

Error to instruct jury that the evidence must be clear and conclusive. 1 Watts & Serg. 245.

*Bard* and *Thomson*, for defendant.—To admit the declarations of Capt. Chambers, and the memorandum in his book as evidence, not only of the contents of a deed, but also of its execution and delivery, would make the statute of frauds a dead letter. There would be no necessity in any case for the formality of a deed. All a man would have to do to part with his title would be to say, he *had* made a deed to another; or to leave a memorandum to that effect where it would be found after his death. The grantee of such imaginary deed would hold against all the world, without even taking possession, or proving an equity upon proof of the claimant's knowledge of such declarations.

Title rests on written evidence, and not on parol declarations. Jackson v. Shearman, 6 Johns. 19. Declarations are evidence against the party making them, and those who hold under him; but without other facts and circumstances, are not conclusive. Gibblehouse v. Story, 3 Rawle, 438, 441, &c. The cases, where declarations *alone* have been held to be of sufficient weight to take away a

man's estate, arise only on such questions as those of boundary, settlement or improvement rights, tenancy, and resulting trusts; as where one man takes the legal title, and another pays the money, which are not within the statute. Ibid. Such are the most of the cases cited. The cases of recitals in deeds and wills have no application. Such recitals operate as estoppels; but declarations or written memoranda have no such effect.

The declaration of one under whom the plaintiffs claimed, that he " sold and conveyed" to the defendant, or to one from whom defendant derived title, has been held to imply that there was a deed, and could not be given in evidence without first proving the loss of the deed. McDonald and wife v. Campbell, 2 Serg. & Rawle, 473. But preliminary to proof of contents, and involving proof of execution, (and delivery is a constituent part of execution,) stands proof of pre-existence in the state of a valid instrument. McReynolds v. McCord, 6 Watts, 290; McCurdy v. The Schuylkill Navigation Company, 3 Whart. 440. Here there is no proof whatever of the execution and delivery of the deed, or that it was ever seen; and the fallacy of the argument of the plaintiffs' counsel is to make the declarations proof both of the existence of the deed and of its contents.

There is no evidence that the memorandum in the book was made before the deed to Brown, or that he ever saw it. It was incumbent on the plaintiffs to show the time it was made. For aught that appears, it may have been made long after Brown had acquired title and become involved. To admit it would open the door to fraud.

The memorandum having been found among the papers of Mr. Chambers after his death, and produced by the plaintiffs themselves, cancelled, must be deemed to have been fairly cancelled; and the deed of which it is the evidence destroyed, by consent of Mrs. Brown before her marriage, or that the deed was without consideration, and never delivered. Any other supposition would imply a charge of fraud on the part of her husband and brother against the rights of Mrs. Brown; which must not be presumed, and is contrary to the proof, for Brown never saw the deed. A deed cancelled by consent of the grantee, in equity restores the estate to the grantor, if such is the intention of the parties. Wiley v. Christ, 4 Watts, 199. The cancelled memorandum being produced as the evidence of, and substitute for the deed, can have no more effect than a cancelled deed would have. When a cancelled deed is produced by a party claiming title under it, he is bound to account for its cancellation,

and to show that it was done by mistake, or the fraud of the other party.

*June* 25.   ROGERS, J.—The entry on the books of Chambers is evidence against him, and all those who claim under him: for it is a memorandum in writing made in the regular course of business, by a person who at the time was the owner, or had an interest in the premises.   The entry is receivable in evidence, as an acknowledgment of title in Esther Brown by the person under whom the defendants claim.   That the confession of a grantor, contrary to his interest at the time, is competent testimony, is settled in Reed *v.* Dickey, 1 Watts, 152; 3 Rawle, 438; 4 Watts & Serg. 392; and in the Union Canal *v.* Young.

The plaintiffs claim title under a lost deed, bearing date the 25th March, 1792—Capt. Benjamin Chambers to Esther Chambers, who afterwards intermarried with William Brown.   Whether there is any evidence of a contract between him and his sister, and whether the deed above-named was delivered, are the principal matters in controversy.   If these facts are decided in favour of the heirs, there is nothing in the way of the plaintiffs' recovery.

It is admitted in the charge that the evidence suffices to show that a deed was made and signed; but it is denied that there is enough to prove the deed was delivered.   The court instruct the jury, not only that there was no delivery, but that there is no evidence whatever of a binding contract between the parties.   Without undertaking to express an opinion as to the weight of the testimony, we think there was evidence on both points proper to be submitted to the jury.

It must be premised that the Chambersburg Bank claiming under the alleged grantor, and having purchased with notice of the plaintiffs' title, stands in the same situation as the grantee; and the case must be considered in the same manner as if Chambers himself was a party.   As against him, we conceive an entry in his own books, and in his own handwriting, would be persuasive evidence, and in some cases would amount to conclusive proof.   The effect to be given to the testimony depends on the entry itself, and the accompanying parol proof.

The words are "Lot No. 3 and 4, granted by deed bearing date the 25th March, 1790.   Lot No. 3 and 4 to Esther Chambers, bounded and described as follows: Beginning at a post on Market street, on the west side of Conocogig; thence with said street westward one hundred and twenty feet, to lot No. 5; thence with said lot north-

ward 256 feet, to a sixteen feet alley; thence with said alley eastward 120 feet, to lot No. 2; thence with said alley southward two hundred and fifty-six feet, to the place of beginning."

The entry is crossed as above, and in a different ink is this memorandum, "Give (or gave) a new deed to Will. Brown, Esquire."

Now, without further explanation, what inference naturally arises from the memorandum, as above stated? Is it not, that there was some contract or understanding in relation to the premises, between Captain Chambers and his sister? For if there was not some agreement, the inquiry suggests itself, why was the entry made in a book kept for the purpose; and why was this registry made in the same manner as appears to have been his practice as to others, who had purchased lots exposed by him to sale on ground-rent? Whether it was a sale for a valuable consideration, which is the most probable supposition, or a gift accompanied with possession, is of no consequence; for in either case, it will pass such a title as cannot be impaired without the assent of the grantee or donee. Besides, that there was a contract of some sort, may be inferred from other testimony. William Brown says, "that in 1791, (viz., after the date of the deed, and his intermarriage with Esther Chambers,) he was looking out for a dwelling-house, when Captain Chambers said to him, 'Why not build on your wife's lot on the west side of the creek? There sister Hetty has two lots, and they are in a fine situation for a dwelling-house.'" There is no mistaking the import of this testimony; and connecting it with the memorandum on the books of Captain Chambers, it is difficult to avoid believing, (certainly as against him, and of course against those who claim under him,) that there is some evidence of a contract or gift, call it which you will, and that the contract was consummated by deed. It is objected, that we have no express evidence of a consideration. If this be wanting, the deed implies one; for we must take it, if a deed was made, it was done in the usual form, passing a fee, and for a valuable consideration expressed in the deed itself. It does not appear, it is true, what the precise nature of the agreement was; nor is it necessary, as whatever it may have been, enough has been shown to justify the jury in presuming a contract.

But was there evidence proper to be submitted to a jury, of the delivery of the deed, supposing that it was signed and sealed by the grantor? This is the next question. On this point we also think the court erred. The entry, as offered, amounts to an express acknowledgment by the grantor, that he had granted by deed the lots in controversy, to his sister. For what is the meaning of the words

"granted by deed," either in legal or common parlance—words, be it observed, to be taken most strongly against the grantor? Do they intend an instrument signed and sealed merely, or are they to be understood, without further explanation, as importing a legal and perfect title? A. informs B. that he has deeded Blackacre to C.; would not a jury, if necessary, be warranted in drawing the natural and obvious inference; that he intended by these expressions a deed in fee-simple, with all the formula necessary to a complete title? That this would be the conclusion of every person, seems to me so obvious as scarcely to admit of question. The words, of themselves, necessarily imply a perfect instrument—one competent to pass the title; and this cannot be, as is well known, without delivery. That less than express proof of delivery will suffice, appears from Long & Ramsey, 2 Serg. & Rawle, 72. In that case, it is ruled, and it scarcely needs the aid of authority, that from the proof of the handwriting of a witness to a deed, a jury may presume a sealing and delivery. And miserable indeed would be the situation of the country if the law was otherwise; particularly as regards transactions of long standing. In accordance with the implication arising from the entry, William Brown says, he was informed by Captain Chambers, and also by his wife, previous to his receiving a deed for the six lots, that there had been a deed for the lots 3 and 4 made to Esther Chambers, before her marriage. Both parties, according to this statement, recognise a subsisting title in her. Connect this testimony with the declaration of Chambers before adverted to, and it is difficult to resist the conviction, if his testimony is believed, that at the time, which, be it observed, was after her marriage and before the deed to Brown, she had a title, accompanied with possession of the property now in dispute. And in corroboration, the explanation given by Brown seems to accord with the entry in the books and the accounts against him. It is true, the entry is crossed or cancelled, and Brown says he never saw the deeds, nor does he know whether they were from her father or brother, nor when nor by whom they were destroyed. That this part of the testimony may be used in argument to the jury, is conceded; but that it justifies the court in withdrawing the whole case from their decision, is denied. But as the entry appears to be crossed or cancelled, it is absolutely necessary, for a just decision of the case, to determine when and by whom it was cancelled; for this is a distinct and different question from those to which we have heretofore adverted. They must be carefully distinguished from each other. It will not be pretended, that if the erasure was made after her mar-

riage, there is any thing in evidence which can divest the rights of the heirs. If the title ever vested in her, it cannot be divested without her assent, and in the manner prescribed by law. The question recurs, when and by whom was the erasure made?' To this the answer is, that a jury may believe it was made after her intermarriage with Brown; and whether with or without her consent, as the case stands, is immaterial. The probability is, that it was crossed on or about the time of the memorandum, which appears to be in a different ink from the entry. And this was, if any reliance is placed in the testimony of Brown, and we may be permitted to judge from the date of the deed, about the 30th April, 1792. At that time she was a feme covert, and incapable of making a contract, except in the manner allowed by statute.

It is alleged, that this view of the case casts an imputation on the integrity of Chambers and Brown. This does not follow; as the reason the deed to Brown assumed its present form, seems to be satisfactorily explained in the testimony, and no doubt arose from a mistaken supposition, that it was of no consequence whether the title was in Esther Chambers or in her husband, William Brown. But these mistaken views cannot deprive her of her title, unless with her own consent, and in the manner the law provides.

As the case goes down for another trial, it is proper to say, that as the defendant is a purchaser, the plaintiff can only avail himself of the title of which he gave notice at the sheriff's sale. This point was ruled in a case decided at Philadelphia at the last term, and not yet reported.

Judgment reversed, and a <em>venire de novo</em> awarded.